Robert R. REICH, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

SOUTHERN NEW ENGLAND TELECOMMUNICATIONS CORP. and The Southern New England Telephone Company, Defendants.

Civ. No. 3:93CV01110 (TFGD).

United States District Court, D. Connecticut.

June 14, 1995.

Albert H. Ross, John S. Casler, James Glickman, Christine Eskilson, Merle D. Hyman, U.S. Dept. of Labor, Office of the Solicitor, Boston, MA, for plaintiff.

Burton Kainen, Miguel A. Escalera, Jr., Sheldon D. Myers, Vaughan Finn, Kainen,

Starr, Garfield, Wright & Escalera, Hartford, CT, for defendants.

## MEMORANDUM OF DECISION

DALY, District Judge.

Robert R. Reich, the Secretary of Labor of the United States Department of Labor ("plaintiff"), brings this action against the Southern New England Telecommunications Corporation and the Southern New England Telephone Company (collectively "SNET") seeking to enjoin SNET from its alleged violation of sections 7, 11, 15(a)(2) and 15(a)(5), the overtime and record-keeping provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"). The plaintiff also seeks back overtime pay and liquidated damages. Specifically, the plaintiff alleges that SNET has a company-wide policy of requiring their outside craft employees to remain on the jobsite and perform uncompensated work during their lunch periods in violation of the FLSA. The matter has been tried to the Court, and the parties have supplemented the record with post-trial briefs and proposed findings of fact and conclusions of law. This memorandum constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

SNET is and was, at all times relevant to the instant matter, a corporation having an office and place of business in New Haven, Connecticut engaged in a telecommunications business at that site and elsewhere throughout the state of Connecticut and is an enterprise within the meaning of sections 3(r) and 3(s) of the FLSA. SNET employees handle, sell or otherwise work on goods or materials that have been moved in or produced for commerce.

SNET operates various garages throughout Connecticut and employs numerous outside craft employees who work out of these garages. Prior to 1990, SNET categorized its outside craft employees as cable splicers, cable repairers and installation and mainte-

nance workers. Beginning sometime in 1990 and continuing until February 1994, SNET's outside craft employees were categorized in three groups: outside plant technicians, assistant supervisors of construction or communications facilities technicians ("CFT"). 1/17/95 Testimony of Allen Lindsey.[1] Outside plant technicians place and remove outside telephone plant, that is, telephone cable, as well as install telephone poles. 1/9/95 Diamen; 1/9/95 Zabisky. Assistant supervisors of construction work with outside plant technicians on certain types of tasks, such as installing telephone poles. 1/9/95 Diamen; 1/12/95 Stuyniski; 1/13/95 Schlaigh; 1/13/95 O'Neill; 1/13/95 Williams. The CFT job category combined the previously separate jobs of cable splicers, cable repairers, and installation and maintenance workers and was designed to cross-train these employees so that each CFT could perform all three job functions as the need arose. 1/10/95 Evans; 1/11/95 Phillips; 1/12/95 Estep; 1/12/95 Shea; 1/13/95 Bigelow; 1/13/95 Donofree; 1/17/95 Lindsey.

The work performed by outside craft employees in the CFT job category varied from employee to employee. Some employees, for example, performed mostly cable repair work; 1/11/95 Remick; while other employees performed primarily cable splicing work; 1/10/95 Evans; 1/11/95 Phillips; 1/12/95 Estep; 1/12/95 Carling; 1/13/95 Campbell; 1/13/95 Kelly; 1/13/95 Pomian; and still others' work was divided between all three job functions to varying degrees. 1/13/95 Donofree (50% splicing, 30% repair, 20% installation).

In February 1994 SNET eliminated the CFT job category and devised yet another way of categorizing its outside craft employees. 1/12/95 Shea; 1/17/95 Lindsey. Under this new category system, outside craft employees who performed cable splicing work were known as network deployment technicians. 1/9/95 Taccone; 1/9/95 Keyser; 1/9/95 Evans; 1/11/95 Carr; 1/11/95 Phillips; 1/12/95 Poe; 1/12/95 Avery; 1/12/95 Estep; 1/13/95 Donofree; 1/13/95 Kelly. Those outside craft employees who performed cable

---

1. Hereinafter the testimony of the witnesses in this case shall be designated by the date of the testimony and the last name of the witness (e.g., 1/17/95 Lindsey).

repair work were categorized as network delivery technicians. 1/10/95 Jennings; 1/10/95 Lankton; 1/11/95 Woll; 1/12/95 Haase; 1/12/95 Estep; 1/12/95 Shea; 1/13/95 Bigelow. Finally, those outside craft employees who performed installation and maintenance work were categorized as service delivery technicians. 1/10/95 Denny.

Outside craft employees, apart from those performing installation and maintenance functions, are assigned work at a variety of job sites. The three main job sites are manhole sites, aerial sites and buried trench sites. 1/9/95 Diamen; 1/9/95 Flynn; 1/10/95 Evans; 1/10/95 Emerson; 1/10/95 Lankton; 1/11/95 Woll; 1/11/95 Sweeney; 1/11/95 Phillips; 1/11/95 Carr; 1/13/95 Longo. Those employees performing installation and maintenance work may perform their work at outside locations from the side of a house to the terminal pole, as well as in residential homes and businesses. 1/10/95 Denny; 1/13/95 Pomian; 1/13/95 Kelly. A small amount of work is performed at central office locations and controlled environment vaults.

During the course of their employment and at all of the various job sites, outside craft employees work with valuable trucks and sophisticated tools, ranging from fresh air ventilation systems, sump pumps, gas testing equipment, bucket trucks, fiber optic equipment and numerous hand tools. 1/9/95 Zabisky; 1/9/95 Evans; 1/10/95 Emerson; 1/10/95 Lankton; 1/11/95 Phillips; 1/11/95 Carr; 1/12/95 Shea; 1/17/95 Bray. The work assignments of outside craft employees may last one day or more, depending upon the work assignment and location, while others may last anywhere from forty-five minutes up to one day. 1/9/95 Keyser; 1/10/95 Lankton; 1/10/95 Murray; 1/11/95 Carr; 1/12/95 Estep. These employees also face many variables when carrying out their work assignments, among them the weather, traffic conditions, the work of other contractors, the condition of the existing telephone plant and equipment, and numerous other circumstances that may arise on any given job on any given day. 1/12/95 Haase; 1/18/95 Weed.

Outside craft employees also are evaluated based on the amount of work they can com-plete in a certain amount of time. To assist in this evaluation, SNET has put in place a system designed to estimate the time requirements of certain tasks, the production expectations of the outside craft employees performing those tasks and to track the efficiency and success these employees achieve against such expectations. This system was called the Job Maintenance Operation System, and is known in SNET by its acronym, "JMOS." 1/10/95 Denny; 1/11/95 Phillips; 1/11/95 Sweeney; 1/13/95 Kochel; 1/13/95 Schlaich; 1/17/95 St. John; 1/20/95 Lawrence. Under JMOS, each work assignment step an employee performs is assigned a particular time estimate. 1/17/95 St. John. An employee's performance is then compared to the time expectations set forth by JMOS and the JMOS performance is compared by geographical area and by employee. 1/10/95 Denny; 1/17/95 St. John.

The outside craft employees are designated as "lunch-carrying" employees. That is, they are required to bring their lunches with them to work. 1/9/95 Diamen; 1/9/95 Taccone; 1/9/95 Keyser; 1/9/95 Zabisky; 1/10/95 Emerson; 1/10/95 Snow; 1/11/95 Woll; 1/13/95 Campbell; 1/13/95 Donofree; 1/17/95 Calkins; 1/20/95 Lawrence; 1/20/95 Albright. They are not paid pay for their lunch periods; 1/9/95 Diamen; 1/9/95 Zabisky; 1/9/95 Taccone; 1/10/95 Evans; 1/10/95 Snow; and SNET does not record as hours worked the lunch periods of their outside craft employees. 1/18/95 Rarus.

The duration of the lunch periods of outside craft employees is thirty minutes. 1/9/95 Diamen; 1/9/95 Flynn; 1/9/95 Taccone. Because of SNET's efforts to coordinate work activities with other field and central office employees, SNET generally instructs outside craft employees to take their half-hour lunch periods at 12:00 noon. 1/9/95 Zabisky; 1/9/95 Taccone; 1/10/95 Lankton; 1/11/95 Sweeney; 1/12/95 Haase; 1/12/95 Shea; 1/13/95 Kochel; 1/13/95 Donofree; 1/13/95 O'Neill; 1/17/95 Gardella; 1/17/95 Lindsey; 1/18/95 Judge; 1/18/95 Walsh; 1/18/95 Sims; 1/20/95 Lawrence. If an outside craft employee takes a later lunch due to conditions then existing at a particular job site, that employee is required to contact the

project supervisor. 1/13/95 Donofree; 1/17/95 Bray; 1/20/95 Lawrence.

Due to the uncertain nature of how long it may take to perform their work, these employees generally do not have a large degree of flexibility to plan when and where they take their lunch periods. 1/11/95 Sweeney; 1/11/95 Remick; 1/12/95 Poe; 1/12/95 Haase; 1/13/95 Campbell; 1/20/95 Albright. On occasion, outside craft employees work through their lunches and are not paid for the time nor able to take a later lunch period. 1/9/95 Keyser; 1/9/95 Taccone; 1/10/95 Murray; 1/11/95 Remick; 1/12/95 Estep; 1/13/95 Bigelow. On other occasions, the employees are interrupted during their lunch periods and do not take extra time. 1/11/95 Sweeney; 1/12/95 Shea.

In those situations in which outside craft employees are at a job site where the work is not yet completed, known in SNET as an "open job site," they are required to remain on those job sites during lunch to provide for the safety and security for the job site, SNET's equipment and telephone plant, as well as provide for the security of any members of the public who might come into contact with the job site. These responsibilities at open job sites were impressed upon the employees by their supervisors when they started employment and regularly are reinforced. 1/9/95 Zabisky; 1/9/95 Diamen; 1/9/95 Taccone; 1/9/95 Keyser; 1/10/95 Snow; 1/10/95 Emerson; 1/11/95 Woll; 1/11/95 Carr; 1/13/95 Campbell; 1/13/95 Donofree; 1/13/95 Kochel; 1/13/95 Pomian; 1/20/95 Lawrence; 1/20/95 Albright; *see also* Pltf.'s Exhs. 2 and 5.[2]

Due to the job site safety and security responsibilities, outside craft employees must remain at open job sites during their lunch periods and maintain awareness of all activity in and around the job site. They eat lunch in the cabs of their trucks or next to the manholes, trenches or telephone poles at which they are working. 1/9/95 Taccone; 1/10/95 Snow; 1/10/95 Murray; 1/11/95 Phillips; 1/11/95 Woll; 1/11/95 Remick; 1/12/95 Avery; 1/12/95 Stuyniski. It is clear that outside craft employees understood that they could be subject to discipline for leaving an open job site unattended during a lunch period. 1/9/95 Taccone; 1/10/95 Snow; 1/10/95 Murray; 1/10/95 Lankton; 1/11/95 Woll; 1/11/95 Remick; 1/11/95 Carr; 1/10/95 Jennings; 1/12/95 Stuyniski; 1/13/95 Longo; 1/12/95 Avery; 1/13/95 Kochel; 1/13/95 O'Neill; 1/20/95 McGrath; Pltf.'s Exhs. 2, 5 and 7.[3] Outside craft employees have been specifically reprimanded for, and forbidden from, leaving open job sites during a lunch period. Steven Emerson, for example, was reprimanded by his foreman for leaving an open job site to get pizza during his lunch period. 1/10/95 Emerson. Thomas Tobey was reprimanded by both his foreman and district manager for leaving an open job site during his lunch period. 1/12/95 Tobey. Joseph Albright, who was in danger of being transferred due to his failure to meet SNET's weight requirements, was told by a supervisor that he could not leave an open job site during lunch to go jogging, even if he locked

**2.** Mark Miner, an assistant supervisor of construction states on the plaintiff's "Employee Personal Interview Statement" as follows: "I am designated by the company as a 'lunch-carrying employee.' That is, I am required to eat my lunch while remaining with my vehicle and job site out in the field, as opposed to eating in a public restaurant. I'd say that about 95% of the time I eat my lunch at an open job site, while only about 5% of the time do I eat lunch 'en route' between job site locations. Like the other [outside plant technicians], I am required to watch over the job site while I eat my lunch, and I am responsible for both job site safety (compliance with company safety rules) and security of company property at the job site, throughout my half hour lunch break each day. This lunch policy was the same when I worked at the New London and Danielson sites." Pltf's. Exh. 3.

**3.** A September 20, 1993 dated memorandum to "all Stamford CFT's and FT's" stated that "[t]he following items are a reinforcement of existing company and local policy. However, in light of the fact that some of these items have not been adhered to we felt that it is once again time to address them. Since everyone here seems to be aware of the need to control expenses we feel you will all agree that the majority of these policies will make us more efficient and cost effective.... 3. all CFT's are considered to be lunch carrying employees, this means that you will bring your lunch with you if you intend to eat. Anyone found at any establishment buying lunch will face discipline." Pltfs.Exh. 7.

his truck. 1/20/95 Albright. SNET also prohibits its outside craft employees from purchasing lunches in restaurants, under threat of discipline. 1/20/95 McGrath; Pltf's. Exh. 7.

Outside craft employees also are prohibited by SNET from dismantling their job sites in an effort to make those sites secure in order to leave for lunch. SNET Exhs. 529 and 531. These employees generally have not been informed that they may secure and leave open job sites during their lunch periods. 1/9/95 Diamen; 1/10/95 Lankton; 1/11/95 Carr; 1/12/95 Estep; 1/13/95 Campbell; 1/13/95 Pomian; 1/13/95 Donofree; 1/13/95 Kochel; 1/20/95 McGrath; 1/20/95 Albright; 1/20/95 Lawrence. Further, even assuming that SNET permitted the outside craft employees to secure and leave an open job site, this option is not realistic given the responsibilities of the employees and the conditions under which they work. To fully secure an open job site an employee must pick up all hand tools, other devices such as the blowers, pumps, and gas testing equipment used on manhole sites, cones, signs and flags (which are arranged according to SNET instructions depending on traffic flow), place them in and secure the SNET vehicle, move the vehicle off the road and out of any traffic lanes, place protection on any exposed telephone plant, possibly including muslin and rubber wraps and tents, and cover any open manholes, trenches or holes dug at telephone pole installation sites. The process then would have to be reversed when the employee returned from his lunch period. 1/9/95 Keyser; 1/13/95 Kochel; 1/20/95 Lawrence. This process of securing a job site from traffic, people, and weather is time-consuming and could take between ten and forty-five minutes. The same amount of time would be required upon the reopening of the job site at the end of the lunch period. 1/9/95 Flynn; 1/10/95 Lankton; 1/10/95 Murray; 1/11/95 Phillips; 1/12/95 Avery; 1/13/95 Kochel; 1/13/95 Donofree; 1/13/95 Longo; 1/20/95 Lawrence.

The work of securing a job site depends, of course, on the particular work being done. If outside craft employees are engaged in lashing cable to strands on telephone poles at aerial sites, the cable frequently is running off the truck to the poles during lunch. 1/13/95 Longo; 1/17/95 Gardella; 1/18/95 Judge. If the outside craft employees are working in a manhole, cable frequently is running from the truck and throughout one or more manholes during lunch. 1/10/95 Murray; 1/20/95 Lawrence. When cable is still attached to the truck, the truck cannot be moved very far, if at all. 1/17/95 Gardella.

The time spent securing and then reopening a job site for the purpose of leaving during lunch periods would greatly affect the efficiency and production expectations under which the employees work. 1/11/95 Phillips; 1/13/95 Kochel; 1/20/95 Lawrence. Further, and even assuming outside craft employees could secure and leave an open job site during their lunch periods, SNET policy dictates that the outside craft employees remain responsible for the safety and security of the job site, and all SNET equipment and telephone plant. 1/10/95 Murray; 1/20/95 Lawrence. Indeed, outside craft employees are trained that an open job site could never, by definition, be considered secure unless they were present to watch over the site. 1/20/95 Lawrence; 1/20/95 Albright.

At open job sites, the valuable and sophisticated tools with which the outside craft employees work usually are spread out on the site during lunch periods so that they are easily accessible to the employees. 1/9/95 Zabisky; 1/10/95 Evans; 1/10/95 Emerson; 1/13/95 Longo; 1/20/95 Lawrence. Outside craft employees on occasion work in high-crime areas; 1/10/95 Woll; 1/10/95 Evans; and SNET has experienced vandalism to vehicles and telephone plant and theft of equipment and tools. 1/9/95 Zabisky; 1/10/95 Murray; 1/10/95 Evans; 1/11/95 Woll; 1/12/95 Poe.

Further, telephone plant is sensitive to the elements and may be vulnerable if left unattended. 1/9/95 Flynn; 1/10/95 Murray; 1/10/95 Lankton; 1/12/95 Shea. Some telephone plant may be damaged in a matter of seconds. 1/12/95 Shea. A cable splice that gets wet by the weather or by groundwater in a manhole could interrupt telephone service for thousands of SNET customers. 1/10/95 Jennings. Moreover, protective de-

vices for telephone plant, such as inflatable rubber seals for manholes, tents and temporary cable wraps often are not fully effective against the elements. 1/10/95 Murray; 1/11/95 Phillips; 1/12/95 Shea. If conditions warrant, outside craft employees may be required to spend their lunch periods holding a tarp over telephone plant to protect the wires from rain. 1/13/95 Pomian. They often are required to check that the pumps and blowers are still functioning; 1/9/95 Flynn; 1/10/95 Murray; 1/11/95 Phillips; 1/12/95 Estep; and are required to pump groundwater out of manholes. 1/9/95 Flynn; 1/10/95 Murray.

The presence of outside craft employees maintaining watch on open job sites during their lunch periods forestalls loss of equipment and protects against damage to work in process. Further, law enforcement and private security personnel present on certain job sites are responsible only for traffic flow. 1/18/95 Walsh. They are not trained in SNET work procedures or in the protection, security and maintenance of telephone plant and equipment. 1/10/95 Snow. They often take their lunch period at the same time the SNET employees do and frequently leave the job site during the lunch period. 1/9/95 Diamen; 1/9/95 Zabisky; 1/9/95 Flynn; 1/9/95 Taccone; 1/9/95 Keyser; 1/10/95 Evans; 1/11/95 Sweeney; 1/11/95 Phillips; 1/11/95 Remick; 1/18/95 Walsh.

Other problems that arise on open job sites involve the safety of the public. Members of the public frequently are curious about SNET's open job sites such as manholes and buried trenches. At other times, people come up to SNET employees on the job site and inquire when telephone service might be restored, or to inform them that service has been interrupted, or simply to ask for directions. 1/9/95 Keyser; 1/9/95 Zabisky; 1/10/95 Murray; 1/12/95 Shea. The outside craft employees are responsible during their lunch periods for keeping the public away from the job sites to prevent injuries. 1/9/95 Zabisky; 1/9/95 Diamen; 1/9/95 Flynn; 1/10/95 Murray; 1/10/95 Emerson; 1/11/95 Woll; 1/11/95 Remick; 1/13/95 Pomian; 1/18/95 Dicenza. Children are attracted to the trucks, ladders and other equipment and

tools present on open job sites and the outside craft employees are responsible during their lunch periods for keeping these children away to prevent injuries and damage. 1/10/95 Lankton; 1/12/95 Avery; 1/12/95 Estep.

Outside craft employees working on a buried trench site at a new construction project eat next to or in view of the trench during lunch to prevent investigation by curious children and persons looking at new homes or other buildings. 1/9/95 Zabisky; 1/11/95 Woll; 1/11/95 Remick. When outside craft employees eat in their trucks in a position facing away from the job site, they instinctively check their rearview mirrors to ensure that the site remains safe and secure. 1/9/95 Diamen; 1/9/95 Flynn; 1/9/95 Taccone; 1/11/95 Woll; 1/17/95 Carey. This allows the employees, if conditions warrant, to direct pedestrian and vehicular traffic during their lunch periods, to move their vehicles or rearrange the job site protection such as cones, flags and signs. 1/9/95 Keyser; 1/9/95 Diamen; 1/9/95 Zabisky; 1/9/95 Taccone; 1/11/95 Carr; 1/11/95 Sweeney; 1/11/95 Phillips. SNET also has made it clear to its employees that if a member of the public was injured at an open job site while outside craft employees were away at lunch, SNET would face litigation and ultimately could be held responsible. 1/17/95 Bray.

The outside craft employees also have a myriad of other responsibilities that may arise during the lunch period. They may, for instance, review blue prints or cable plates to prepare for the next phase of that or any other project. 1/9/95 Keyser; 1/10/95 Snow; 1/10/95 Emerson; 1/10/95 Lankton; 1/11/95 Remick; 1/11/95 Sweeney; 1/12/95 Poe; 1/12/95 Avery. Some employees fill out their time sheets during their lunch periods. 1/9/95 Diamen; 1/11/95 Sweeney. Others still may be required to discuss the job with their supervisors, who often visit the site during the lunch period. 1/9/95 Diamen; 1/9/95 Flynn; 1/10/95 Emerson; 1/10/95 Zabisky; 1/11/95 Sweeney; 1/12/95 Tobey; 1/12/95 Shea; 1/13/95 Kelly. Outside craft employees in some instances are required to monitor beepers and radios during their lunch periods. 1/9/95 Diamen; 1/9/95 Zabi-

sky; 1/10/95 Lankton; 1/13/95 O'Neill. The picture that undeniably was painted at trial was that the outside craft employees were required to remain at open job sites during their lunch period to perform substantial duties for the benefit of SNET and its business.

The evidence demonstrates that, on average, outside plant technicians (job codes 202497 and B00955) carry out compensable responsibilities and duties on open job sites for at least 80% of their lunch periods, or four lunch periods per week. 1/9/95 Diamen (90%); 1/9/95 Zabisky (85%); 1/10/95 Snow (90%); 1/10/95 Emerson (80%); 1/13/95 Longo (90%); 1/13/95 O'Neill (90%). This percentage estimate reasonably excludes noncompensable lunch periods. Further, assistant supervisors of construction (job code M10070) on average carry out compensable responsibilities and duties on open job sites for at least 60% of their lunch periods, or three lunch periods per week. Pltf.'s Exh. 2 (Miner (95%)); Pltf.'s Exh. 5 (Grenier (90%)); 1/12/95 Stuyniski; 1/13/95 Schlaich; 1/13/95 O'Neill. This percentage estimate also reasonably excludes noncompensable lunch periods.

Further, on average, network deployment technicians (job code B00882) carry out compensable responsibilities and duties on open job sites for at least 60% of their lunch periods, or three lunch periods per week. 1/9/95 Taccone ("almost all"); 1/9/95 Keyser (almost 100%); 1/10/95 Evans ("nearly all the time"); 1/11/95 Phillips ("almost all"); 1/11/95 Carr (100%); 1/12/95 Poe ("most of the time"); 1/12/95 Avery (90%); 1/12/95 Estep (90%); 1/13/95 Donofree (80%); 1/13/95 Kelly (80%). This percentage estimate reasonably excludes noncompensable lunch periods. Network delivery technicians (job code B00320) carry out compensable responsibilities and duties on open job sites for at least 60% of their lunch periods, or three lunch

periods per week. 1/10/95 Jennings ("almost all"); 1/10/95 Lankton (75–80%); 1/11/95 Remick (98–99%); 1/11/95 Woll (50%); 1/12/95 Haase (60%); 1/12/95 Estep (50%); 1/12/95 Shea (50%); 1/13/95 Bigelow ("quite often"). This percentage estimate reasonably excludes noncompensable lunch periods.

Finally, due to their multiple job functions and the fact that installation and maintenance work can involve outside locations, on average CFTs (job code 903091) carried out compensable responsibilities and duties on open job sites for at least 60% of their lunch periods, or, again, three lunch periods per week. This percentage estimate reasonably excludes noncompensable lunch periods.[4]

## CONCLUSIONS OF LAW

### 1. *Liability*

The FLSA generally requires the payment of a minimum hourly wage to all employees engaged in commerce or in the production of goods for commerce and also requires employers to pay employees at least one and one-half their regular pay rate for hours worked beyond 40 per week. 29 U.S.C. § 207(a)(1). *See Reich v. New York Transit Authority*, 45 F.3d 646, 649 (2d Cir.1995). The plaintiff claims that SNET has a company-wide policy of requiring its outside craft employees to remain on the job site and perform uncompensated work during their lunch periods and that this policy thus violates the FLSA.

In an effort to address the compensability of meal periods, the Department of Labor promulgated a regulation, 29 C.F.R. § 785.19, entitled "Bona fide meal periods." That regulation provides as follows:

(a) *Bona fide meal periods.* Bona fide meal periods are not worktime. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest peri-

---

4. The Court finds, in accordance with the stipulation between the parties, that the plaintiff is not seeking back wages on behalf of outside craft employees during periods when such employees are engaged in the installation and activation of phone service in residential homes and business. Due to their multiple job functions, it is impossible to identify those employees in the CFT job category who were solely engaged in the installa-

tion and activation of telephone service in residential homes and businesses. 1/17/95 Gorman. Plaintiff is not seeking back wages on behalf of those employees categorized as service delivery technicians. (Pltf's.Exhs. 1 and 9). Nor is the plaintiff seeking back wages on behalf of outside craft employees for days on which such employees are able, due to their work situation, to take a thirty minute lunch break en route.

ods. The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating. (*Culkin v. Glenn L. Martin, Nebraska Co.,* 97 F.Supp. 661 (D.Neb. 1951), aff'd 197 F.2d 981 (C.A.8, 1952), cert. denied 344 U.S. 888 [866] [73 S.Ct. 108, 97 L.Ed. 671] (1952); *Thompson v. Stock & Sons, Inc.,* 93 F.Supp. 213 (E.D.Mich.1950), aff'd 194 F.2d 493 (C.A.6, 1952); *Biggs v. Joshua Hendy Corp.,* 183 F.2d 515 (C.A.9, 1950), 187 F.2d 447 (C.A.9, 1951); *Walling v. Dunbar Transfer & Storage Co.,* 3 W.H. Cases 284; 7 Labor Cases para. 61.565 (W.D.Tenn.1943); *Lofton v. Seneca Coal and Coke Co.,* 2 W.H. Cases 669; 6 Labor Cases para. 61,271 (N.D.Okla.1942); aff'd 136 F.2d 359 (C.A.10, 1943), cert. denied 320 U.S. 772, 64 S.Ct. 77, 88 L.Ed. 462 (1943); *Mitchell v. Tampa Cigar Co.,* 36 Labor Cases para. 65, 198, 14 W.H. Cases 38 (S.D.Fla.1959); *Douglass v. Hurwitz Co.,* 145 F.Supp. 29, 13 W.H. Cases (E.D.Pa.1956)).

(b) *Where no permission to leave premises.* It is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period.

Courts interpreting this regulation generally chose from two related standards. The first, the "predominant benefit test," assesses whether the employee's meal time is spent primarily for the employer's benefit, *see, e.g. McGrath v. City of Philadelphia,* 864 F.Supp. 466 (E.D.Pa.1994); *Oakes v. Commonwealth of Pennsylvania,* 871 F.Supp. 797 (M.D.Pa.), and generally has been applied in cases involving law enforcement. *But see Hill v. United States,* 751 F.2d 810, 813–14 (6th Cir.1984) (postal employee). The second, the "completely relieved from duty" standard, focuses on whether an employee is

actually completely free of any work-related tasks, *see, e.g. Kohlheim v. Glynn County, Ga.,* 915 F.2d 1473 (11th Cir.1990); *Rotondo v. City of Georgetown, S.C.,* 869 F.Supp. 369 (D.S.C.1994), and generally has been applied in non-law enforcement cases. *But see Wahl v. City of Wichita,* 725 F.Supp. 1133 (D.Kan. 1989) (police officer); *Nixon v. City of Junction City,* 707 F.Supp. 473 (D.Kan.1988) (same). What has been described as a third standard, *see, e.g.; Rotondo v. City of Georgetown, S.C.,* 869 F.Supp. 369, 375–76 (D.S.C.1994); *Bagrowski v. Maryland Port Authority,* 845 F.Supp. 1116, 1119 (D.Md. 1994), recently adopted by at least three courts, *see Armitage v. City of Emporia, Kansas,* 982 F.2d 430 (10th Cir.1992); *Lamon v. City of Shawnee, Kan.,* 972 F.2d 1145, 1157 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1414, 122 L.Ed.2d 785 (1993); *Burnison v. Memorial Hospital, Inc.,* 820 F.Supp. 549 (D.Kan.1993), examines whether the employees are "primarily engaged in work-related duties" during their meal breaks.

The plaintiff claims that the appropriate standard is whether the employees are "completely relieved from duty," *see, Kohlheim,* supra, while SNET claims that the test is whether the lunch period is spent "predominately for the benefit of the employer." *See, e.g., Henson v. Pulaski County Sheriff Dept.,* 6 F.3d 531 (8th Cir.1993). The plaintiff also notes that because of the safety and security responsibilities of the outside craft employees, as well as the restrictions placed on the employees during their lunch periods, the Court also must make a finding under the predominant-benefit standard. *See* Pltf's Post–Trial Mem. at 10, n. 5. The Second Circuit has not articulated the standard to be used in determining the compensability of meal periods under the FLSA.

Much has been made about the distinction between the phrase "completely relieved from duty" as used in § 785.19 and the use of that phrase in 29 C.F.R. § 553.223, a regulation addressed to the meal periods of law enforcement personnel. While § 553.223 is not implicated directly in the instant matter, resolution of cases involving that section are helpful in defining the meaning of the phrase

"completely relieved from duty" in § 785.19. Section 553.223, entitled "Meal Time," provides in relevant part as follows:

(a) If a public agency elects to pay overtime compensation to firefighters and law enforcement personnel in accordance with section 7(a)(1) of the Act, the public agency may exclude meal time from hours worked if all the tests in s 785.19 of this title are met.

(b) If a public agency elects to use the section 7(k) exemption, the public agency may, in the case of law enforcement personnel, exclude meal time from hours worked on tours of duty of 24 hours or less, provided that the employee is completely relieved from duty during the meal period, and all the other tests in s. 785.19 of this title are met. On the other hand, where law enforcement personnel are required to remain on call in barracks or similar quarters, or are engaged in extended surveillance activities (e.g., "stakeouts"), they are not considered to be completely relieved from duty, and any such meal periods would be compensable.

A great deal of confusion concerning the application of these two regulations has arisen in recent years, much of it attributable to a somewhat contradictory decision by the Tenth Circuit in *Lamon v. City of Shawnee, Kan.,* supra. In *Lamon,* a police case, the Tenth Circuit sought to reconcile the meaning of "completely relieved from duty" under § 785.19(a), covering employees generally, with that phrase as used in § 553.223(b), governing law enforcement personnel, and rejected the district court's jury instruction that "the performance of any official duty, no matter how insignificant, during meal periods rendered the time compensable." *Lamon,* 972 F.2d at 1157–58 & n. 18. The court held that if, during meal periods, an "officer's time and attention are primarily occupied by a private pursuit, presumably the procurement and consumption of food, then the officer is completely relieved from duty." *Id.* at 1157. If, however, the officer's "time or attention is taken up principally by official responsibilities that prevent the officer from comfortably and adequately passing the mealtime," that

officer is not completely relieved from duty. *Id.* at 1157–58.

Apparently taking its cue from the *Lamon* court, the Eleventh Circuit built on the supposed distinction between two sections. *See Avery v. City of Talladega, Ala.,* 24 F.3d 1337 (11th Cir.1994). The *Avery* court, in comparing sections 785.19 and 553.223, noted two differences between them. First, the former section contained the following sentence, which the latter did not: "The employee is not completely relieved if he is required to perform any duties, whether active or inactive, while eating." The second difference was in the case illustrations given in each section. The *Avery* court stated that "[l]ogically, section 553.223(b) would be superfluous if it did nothing more than reiterate the standard announced in section 785.19(a). The different examples given of when a meal is compensable indicate that a higher level of duty is required before meal breaks are compensable for section 7(k) law enforcement employees than for other types of employees." *Avery,* 24 F.3d at 1345. The *Avery* court also held that the presence of the phrase "any duties whether active or passive" not found in 553.223(b) supported its conclusion. Thus the court held that the two sections annunciate two different standards. The standard set out in § 553.223, it held, is the predominant-benefit test, which assesses whether the time is spent "predominantly for the benefit of the employer," 24 F.3d at 1345, while the standard set out in § 785.19, "the completely relieved from duty" test, assesses "whether the employees are subject to real limitations on their personal freedom which inure to the benefit of their employer." *Id.* (citing *Kohlheim v. Glynn County, Ga.,* 915 F.2d 1473, 1478 & n. 20 (11th Cir.1990)).

Other courts that have examined this issue have found an apparent contradiction in the *Lamon* court's treatment of the distinction between the two sections and thus have come to a conclusion different than what the *Avery* court held. In *Lamon,* in footnote 18 the court stated the following:

In coming to this conclusion, we note that our interpretation of the "completely relieved from duty" standard only applies to that phrase as used in § 553.223(b).

For that reason, with respect to the application of the "completely relieved from duty" standard in *Wahl v. City of Wichita,* 725 F.Supp. 1133 (D.Kan.1989) and *Nixon v. City of Junction City,* 707 F.Supp. 473 (D.Kan.1988), both of which relied on § 785.19 in ruling that meal periods of police officers were compensable, we make no comment, except for noting the following. While both decisions adhered to a "completely relieved from duty" standard, the court in *Wahl,* after citing the predominant benefit test, stated: "What matters in meal period cases is whether the employee is subject to real limitations on his personal freedom which inure to the benefit of his employer." 725 F.Supp. at 1144. In *Nixon* the court found that the plaintiff police officers in that case performed "substantial duties" during their lunch periods. 707 F.Supp. at 478. Moreover, our contrasting of the two sections, § 553.223(b) and § 785.19, does not mean that the "completely relieved from duty" standard as used in the latter section should necessarily take on a different meaning than that of the former section. *See, e.g., Hill v. United States,* 751 F.2d 810, 813–14 (6th Cir.1984) (applying predominant benefit test to meal periods of letter carrier under § 785.19).

In one of the later cases, *Burnison v. Memorial Hospital, Inc.,* 820 F.Supp. 549, 557 (D.Kan.1993), for example, involving medical personnel employed by a hospital and the application of section 785.19, the court, drawing its conclusion from footnote 18 of the *Lamon* decision, held that it did "not perceive any material difference between the standards governing the compensability of meal periods for cases where the § 785.19 regulation is applicable as opposed to cases where the § 553.223 regulation is applicable."

In another case, *Brinkman v. Dept. Of Corr. Of State of Kansas,* 804 F.Supp. 163, 171 (D.Kan.1992), the court noted that *Lamon* "strongly implies that the "completely relieved from duty" standard appearing in both § 553.223(b) and § 785.19 has the same meaning." The *Brinkman* court also stated that, because that case involved corrections officers whose duties were similar to law enforcement employees covered by § 207(k), "[p]resumably, the same circumstances justify taking the same approach to meal period times for those similarly employed whether covered by § 207(k) or not." *Id.* The *Brinkman* court also disputed the importance of the differences between the two sections. First, it noted the fact that § 553.223 expressly adopts the completely relieved from duty standard "and all the other tests in § 785.19." *Id.* at 170 n. 8. Next, it stated that those cases that considered the differences between the case illustrations "attached more significance to the illustrations than was intended apparently by the Department of Labor.... At best, the example at § 553.223(b) illustrates a common situation for § 207(k) employees and does not suggest a different meaning for the "completely relieved from duty" standard. *Id.* at n. 9. While the instant matter does not involve law enforcement employees, the court is not persuaded that the standard governing law enforcement employees under § 553.223 is different from the standard governing employees generally under § 785.19. The traditional principles underlying the FLSA support this conclusion.

While the FLSA does not define "work," the Supreme Court has construed it to mean "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 598, 64 S.Ct. 698, 703, 88 L.Ed. 949 (1944). The Supreme Court held that the test for whether an employee is "working" and thus presumably entitled to compensation is whether the time is spent primarily for the benefit of the employer or for the benefit of the employee. *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944); *Skidmore v. Swift & Co.,* 323 U.S. 134, 136–37, 65 S.Ct. 161, 162–63, 89 L.Ed. 124 (1944); *see also Oakes v. Commonwealth of Pennsylvania,* 871 F.Supp. 797, 799 (M.D.Pa.1995). In *Skidmore,* 323 U.S. at 136, 65 S.Ct. at 162–63, the Supreme Court stated that it had not attempted to, nor could it, "lay down a legal formula to resolve cases

so varied in their facts as are the many situations in which employment involves waiting time." Rather, the Supreme Court in *Armour* and *Skidmore* directed that lower courts "should adopt a practical approach based on the realities of each case in determining whether employees were spending certain periods of time predominately for the benefit of the employer or for their own benefit." *McGrath*, 864 F.Supp. at 480 (citing *Armour*, 323 U.S. at 133, 65 S.Ct. at 168; *Skidmore*, 323 U.S. at 136–37, 65 S.Ct. at 162–63). *See also Wahl*, supra.

In *Hill v. United States*, 751 F.2d 810 (6th Cir.1984), the court applied the predominant-benefit standard to a postal employee covered by § 785.19. It approved the district court's conclusion that the postal employee's meal period was not compensable because he was not required to perform any activities that could be characterized as substantial duties. That holding was "based on the need for a flexible and realistic standard for compensability and on the particular circumstances of this case." *Id.* at 814. Thus, the *Hill* court used the predominant-benefit test in a case involving non-law enforcement personnel subject to § 785.19 and is in line with Supreme Court precedent in *Armour* and *Skidmore*.

Further, in *Wahl v. City of Wichita*, 725 F.Supp. 1133 (D.Kan.1989), a case involving the compensability of meal periods under § 785.19, the court stated that "[w]hat matters in meal period cases is whether the employee is subject to real limitations on his personal freedom which inure to the benefit of his employer." In adopting the "completely relieved from duty" standard set out in § 785.19, the court reviewed the restrictions imposed on police officers and reached two conclusions: that the officers were subject to serious and substantial limitations and duties during their meal periods and that these restrictions produced benefits for the city. Thus it appears that in interpreting the completely relieved from duty standard the *Wahl* court applied the predominant-benefit test set out in Supreme Court precedent.

Nonetheless the plaintiff appears to argue that the Court in this matter should adopt the literal meaning of the phrase "completely relieved from duty" and hold that if the employees are required to perform *any* duty during the lunch period the lunch period is compensable. In support of this the plaintiff relies on cases such as *Kohlheim*, supra, *Donovan v. Bel–Loc Diner, Inc.*, 780 F.2d 1113 (4th Cir.1985), and *Burgess v. Catawba County*, 805 F.Supp. 341 (W.D.N.C.1992). In *Kohlheim*, the court held that the test was "whether the employees are subject to real limitations on their personal freedom which inure to the benefit of their employer." 915 F.2d 1473 at 1478 & n. 20. It did not, however, adopt the strict interpretation apparently advocated by the plaintiff. Further, in *Burgess v. Catawba County*, the court relied on and simply restated the holding in the *Kohlheim* decision and in *Donovan v. Bel–Loc Diner, Inc.*, the Fourth Circuit offered little analysis of the "completely relieved of duty" standard. Rather, it simply paraphrased section 785.19 in a footnote. *See* 780 F.2d at 1116 n. 1.

The plaintiff also argues that the interpretive regulations are entitled to great weight. While the Second Circuit holds that the regulations "are entitled to considerable weight," *Reich v. State of New York*, 3 F.3d 581, 588 (2d Cir.1993), "[t]he measure of deference to which they are entitled depends upon their persuasiveness." *Id.* (citing *Skidmore*, 323 U.S. at 140, 65 S.Ct. at 164). The literal interpretation the plaintiff advocates goes beyond what the regulation sets out and is at odds with at least some of the authority set forth in the regulation itself. In *Thompson v. Stock & Sons, Inc.*, 93 F.Supp. 213 (E.D.Mich.1950), aff'd 194 F.2d 493 (6th Cir. 1952), for example, a case upon which the Sixth Circuit in *Hill* relied, the court did not apply the regulation with the rigidity the plaintiff now seeks. Rather, the *Thompson* court held that "[t]ime spent predominantly for the employer's benefit during a period, although designated as a lunch period or under any other designation, nevertheless constitutes working time compensable under the provisions of the Fair Labor Standards Act." (citing *Armour* and *Skidmore*). Nowhere does that court espouse the rigid and literal interpretation the plaintiff urges the Court to adopt.

The predominant-benefit standard also is in accord with the majority of cases that have addressed the issue of the compensability of meal periods. The majority of these courts have merely interpreted the regulations as providing for the predominant benefit test. *See e.g., McGrath,* 864 F.Supp. at 480–81 (citations omitted); *see also Oakes v. Commonwealth of Pennsylvania,* 871 F.Supp. 797, 799–800 (M.D.Pa.1995); *Wahl,* supra.

■ Further, despite the plaintiff's contentions otherwise, the "predominant benefit" test has been applied in the context of non-law enforcement cases. *See Hill v. United States,* 751 F.2d 810, 814 (6th Cir. 1984), *cert. denied,* 474 U.S. 817, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). Finally, the Court sees little sense in applying, as the plaintiff claims it must, the predominant benefit test to the security work the SNET employees perform during their lunch periods and the claimed strict completely relieved from duty standard to other functions the employees perform during the lunch periods. The Court thus finds that the literal interpretation of the completely relieved from duty standard, as well as the split approach advocated by the plaintiff depending upon the work being performed by the employees, conflict with longstanding Supreme Court precedent admonishing lower courts to use a practical, realistic approach under the circumstances of each case. Accordingly, the Court will examine the plaintiff's claims under the traditional standard.

■ The evidence adduced at trial makes it clear that SNET's outside craft employees are required to perform substantial duties during the lunch periods that are predominately for the benefit of SNET and its business. It has long been the policy of SNET that its outside craft employees are a "lunch-carrying" crew. SNET's policy that each employee was responsible for the safety and security of the job site was ingrained in them from the very beginning of their tenure with the company and that if they left the job site during lunch they would face disciplinary action. While the employees' views of their responsibilities during the lunch period vary depending upon the type of site at which they are working, the common theme is that they cannot leave the site during lunch and are required to perform substantial duties that benefit SNET.

SNET's claim of substantial flexibility with regard to lunch periods is not supported by the testimony. The employees testified that there was usually a need to coordinate their work with other field workers and with the central office and so they are told to take their lunches at noon. Further, no credible testimony was given concerning SNET's alleged longstanding policy that an employee could secure an open job site in order to leave it to take lunch. Even if such a policy was in place, and the Court does not believe that it was, there is no realistic way for these field employees to take advantage of it. The testimony established, for example, that the employees were required stay on the job site to keep the site safe, to monitor the radio for emergency calls, to let the foreman know where they were, to watch for blind and otherwise handicapped persons, and to ensure the safety and security of SNET trucks, equipment, tools and telephone plant. Many of the responsibilities depended upon the site at which an employee was working. At an open manhole site, for example, the testimony established that the employees were required to monitor the manhole during lunch to keep the pump running to ensure that the water level didn't rise and damage SNET plant, to keep the manhole ventilated, to ensure the safe and proper flow of traffic around the manhole, and to ensure that people didn't wander into the work area and fall into an open manhole. In those instances at a manhole where the employees were installing fiber optic cable, the cable was kept on a reel that was secured in the back of the SNET truck and fed into the manhole as it was pulled to another manhole. The testimony established that it would not be feasible for the employees to suspend their work and dismantle the entire operation in order to take lunch and that the field employees were not allowed to break down an open manhole for the purpose of taking a lunch period. Rather, the testimony established that the employees were required to keep a vigil over the manhole to prevent accidents or damage and to prevent the necessity of breaking

down the site, all of which inured primarily to SNET's benefit. Indeed, the testimony established that it was the company's policy to keep an open manhole guarded because breaking the job site down would take too much time and would be inefficient. Further, SNET's claim that the employees could secure the site and leave to take lunch rings hollow in view of the fact that the employees cannot do so and maintain the standards required by SNET through its use of the Job Maintenance Operation System ("JMOS"). *See, e.g., Nixon v. City of Junction City, Kan.*, 707 F.Supp. 473, 479 (D.Kan.1988) ("Despite the fact that officers are allowed to attend to personal activities during their lunch periods, ... the defendant discouraged such activities and made it impractical to run personal errands (*e.g.*, the officers are not allowed to use the patrol cars for personal business). Consequently, the court accords little weight to the fact that officers can spend their lunch periods as they please."). The Court concludes that the outside craft employees perform substantial duties during their lunch periods that are predominantly for the benefit of SNET and its business and thus these employees are not completely relieved from duty as contemplated by the FLSA.

■ In reaching this conclusion, the Court recognizes that not every employee who had performed work for which that employee was not compensated testified in this matter. It is well established, however, that not all employees need testify in order to prove the violations or to recoup back wages. Rather, the Secretary can rely on testimony and evidence from representative employees to meet the initial burden of proof requirement. *Secretary of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir.1991); *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) (8 out of 300 employees testified); *McLaughlin v. Ho Fat Seto*, 850 F.2d 586 (9th Cir.1988) (5 out of 28); *Donovan v. Williams Oil Co.*, 717 F.2d 503 (10th Cir.1983) (19 out of 34); *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir.1973) (16 out of 26); *McLaughlin v. DialAmerica Marketing, Inc.*, 716 F.Supp. 812 (D.N.J.1989) (43 out of 393); *Donovan v. Kaszycki & Sons Contractors, Inc.*, 599 F.Supp. 860, 868 (S.D.N.Y. 1984); *Marshall v. Brunner*, 500 F.Supp. 116 (W.D.Pa.1980) (48 out of 93).

In *DeSisto*, the First Circuit held that the Court must balance the need in FLSA cases to meet the burden of demonstrating a *prima facie* case with Federal Rule of Evidence 403, which enables a trial judge to exclude needlessly cumulative evidence, and that this balancing act should be performed on the record. In *McLaughlin v. Ho Fat Seto*, the Court held that "the testimony of the Secretary's five employee witnesses, while inconsistent in terms of exact days and hours of overtime worked, established 'as a matter of just and reasonable inference,' that all of the employees regularly worked over eight hours on weekdays and over six hours on many Saturdays." The *DeSisto* court held that "[w]here the employees fall into several job categories, it seems ... that, at a minimum, the testimony of a representative employee from, or a person with first-hand knowledge of, each of the categories is essential to support a back pay award." *See Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83 (10th Cir.1983); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468 (11th Cir.1982); *Dole v. Solid Waste Services, Inc.*, 733 F.Supp. 895 (E.D.Pa.1989).

In this case the plaintiff offered the testimony of 39 witnesses and, in accord with the Court's finding on the record during the trial of this matter, these witnesses constitute a representative sample of each of the five categories of outside craft employees.[5] Further, for the reasons set forth above, the Court finds that the plaintiff has established, "as a matter of just and reasonable inference," that employees in each of the five categories performed work on a regular basis

---

5. Although the plaintiff did not offer direct testimony from an Assistant Superintendent of Construction ("ASC"), a number of employees who worked with ASCs on a regular basis testified as to their job responsibilities during the meal periods. Accordingly, the Court finds that this testimony is sufficient to establish a representative sample. *See Secretary of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir.1991) ("The testimony of a representative employee from, or a person with first-hand knowledge of, each of the categories is essential to support a back pay award.").

for which they were not compensated. Accordingly, the Court finds that the plaintiff has established a pattern and practice of violations of the FLSA by SNET as set forth in the plaintiff's complaint.

### 2. *Damages*

The plaintiff moves for an award of back pay and liquidated damages based on SNET's failure to compensate the employees for work performed during meal times and for failure to keep proper records as required by the FLSA. Under section 11(c) of the FLSA, the employer has the duty to keep proper records of wages and hours worked by employees. 29 U.S.C. § 211(c); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946). In this case SNET has failed to keep adequate records as to what portion of the meal periods were spent working on behalf of the employer. Further, SNET only produced certain records concerning offsets and credits after the Court ordered it to do so during the course of the trial. Thus the task of determining the number of hours worked by employees in each of the five categories was difficult at best. The Supreme Court in *Anderson v. Mt. Clemens Pottery Co.* reviewed the problems associated with an employer's failure to maintain the records required by the FLSA. After weighing the competing equities and finding that employees should not be penalized by an employer's failure to comply with its statutory duty to maintain proper records, the Supreme Court specified the burden of proof applicable in determining whether an employee is entitled to back pay under the FLSA. The Supreme Court held:

> When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. See Note, 43 Col. L.Rev. 355.

*Id.* at 687–88, 66 S.Ct. at 1192.

The plaintiff's back wage computations are based on certain job codes provided with the data received pursuant to the Court's order during discovery. Five of these job codes relate to the specific job titles at issue in this case.[6] Here the plaintiff has established that the employees performed work during their meal periods for which they were not compensated. Further, the plaintiff's estimate concerning outside plant technicians that in a normal work week four out of five lunch periods should have been compensated, based on the evidence produced at trial, is sufficient evidence as a matter of just and reasonable inference. Also sufficient as a

---

**6.** The job codes are as follows: M10070 represents the assistant superintendents of construction; B00320 represents the network delivery technicians; B00882 represents the network deployment technicians; 202497 and B00955 represent outside plant technicians; and, 903091 represents the group formerly known as Communications Facilities Technicians ("CFTs"). The data for the CFTs concerns a time period during which SNET combined cable repairers, cable splicers and installers under a single job title and provided for cross-training and cross-over of job assignments.

matter of just and reasonable inference and under the circumstances of this case is the plaintiff's estimate that the remaining four categories of employees performed work primarily for the benefit of SNET during their lunch periods three days out of every week. The Court notes that for each work week the plaintiff's back wage computations utilize each employee's rate of pay as set forth in SNET records and use only "worked hours" as set forth in those records. Thus, the plaintiff's back wage calculations do not include, for example, vacation periods and holiday weeks during which an employee might not have actually "worked" a full forty hour week. Finally, as set forth above, SNET was unable to come forward with "evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the [plaintiff's] evidence." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. at 687–88, 66 S.Ct. at 1192.

As noted earlier, section 11 of the Act requires employers to maintain payroll records and to make such records available to plaintiff. Further, the statute of limitations for non-willful violations of the FLSA is two years. *See* 29 U.S.C. § 255(a). For the purpose of calculating and applying the statute of limitations period, an action under § 16(c) is commenced as to an individual employee "on the date when the complaint is filed if he is specifically named as a party plaintiff in the complaint, or if his name did not so appear, on the subsequent date on which his name is added as a party plaintiff in such action." 29 U.S.C. § 216(c).

The initial complaint in this matter was filed on June 2, 1993. Part of that complaint was a document entitled "Exhibit A," which listed 86 names of affected SNET employees. On July 30, 1993 the plaintiff served on SNET a request for the production documents in which it sought the names, titles and payroll records of all individuals in the five positions at issue in the instant lawsuit. This information was not provided in SNET's September 30, 1993 discovery responses and SNET delayed in complying with this discovery request, as well as in complying with section 11 of the FLSA, and continued that

noncompliance throughout the discovery period. On March 15, 1994 the plaintiff filed a motion to amend the complaint to which was attached a revised Exhibit A. The names on the revised Exhibit A were not, however, in alphabetical order. The motion to amend was granted on April 14, 1994. On May 16, 1994 the plaintiff forwarded to the Court a third Exhibit A, which attempted to place the names on the second Exhibit A in alphabetical order. In placing these names in such order, however, the plaintiff inadvertently omitted several hundred names of affected employees from the third Exhibit A.

During trial, the defendant amended its answer to plead the statute of limitations as a defense. In response to the defendant's motion, and because the statute of limitations defense then became an issue, the plaintiff made an oral motion requesting that the Court treat all three Exhibits A (which contain those names currently listed in Plaintiff's Exhibit 9) as having added all affected employees' names to the complaint as of August 30, 1993, the date SNET's response to the plaintiff's request for production should have been answered. The Court at that time deferred ruling on the plaintiff's motion.

■ In light of SNET's failure to comply with section 11 of the FLSA and to respond timely to the plaintiff's request for production, and as SNET should not be allowed to benefit from its delayed compliance, *see Anderson v. Mt. Clemens Pottery Co.,* equitable considerations dictate that the statute of limitations be tolled as of August 30, 1993 for the outside craft employees currently listed in Plaintiff's Exhibit 9. Accordingly, the plaintiff's oral motion is hereby GRANTED.

■ The Court finds that Plaintiff's Exhibit 9 accurately computes, as a matter of just and reasonable inference, back wages owed by SNET to its outside craft employees for compensable duties and responsibilities performed during lunch periods from October 12, 1991 (the date to which the plaintiff's back wage calculations go) through April 30, 1994. For each workweek, plaintiff's computations use each employee's actual rate of pay as taken from SNET records. The computations also use only "worked hours" from those records. The amount of "worked

hours" per week are then added to the estimate of unpaid lunch time. If the total is over forty in a given week, back wages are computed at time and one half the employee's regular rate, on a week by week basis. For certain work situations SNET pays its employees premium rates of pay over time and a half, which are creditable toward SNET's overtime obligation. Plaintiff has applied these credits on a workweek by workweek basis, as required by 29 C.F.R. § 778.104, and the relevant case law. *See Roland Electrical Co. v. Black,* 163 F.2d 417 (4th Cir.1947), *cert. denied,* 333 U.S. 854, 68 S.Ct. 729, 92 L.Ed. 1135 (1948); *see also Walling v. Helmerich & Payne,* 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29 (1944); *Overnight Motor Transport Co. v. Missel,* 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942).

 Section 216(c) of the FLSA mandates the award of liquidated damages unless, as qualified by 29 U.S.C. § 260, the "employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]," at which point the court "may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216. *See Reich v. Waldbaum,* 52 F.3d 35, 36 n. 3 (2d Cir.1995); *see also Burgess v. Catawba County,* 805 F.Supp. at 350. When a court considers the issue of liquidated damages, the defendant has the burden of proving "that its actions were objectively reasonable and prompted solely by good faith. If either of these two prongs cannot be met, the Court must award liquidated damages." *Burgess v. Catawba County,* 805 F.Supp. at 350.

 Here, SNET has failed to meet this burden. As the evidence demonstrated, SNET had a longstanding policy not only requiring its outside craft employees to remain on the job sites and perform substantial duties during their lunch periods, but of threatening, and in some cases imposing, discipline on those employees who violated the policy. It is not objectively reasonable, in light of the facts developed in this matter, for SNET to fail to compensate the outside craft

employees for the work they perform during their lunch periods. Nor can it be said that SNET's actions were prompted by good faith. Accordingly, liquidated damages in an amount equal to the back overtime pay shall be awarded to the plaintiff.

For the period from October 12, 1991 through April 30, 1994, the plaintiff shall submit a proposed form of order specifically addressing Plaintiff's Exhibit 9 and calculating the back overtime pay and liquidated damages due, after consideration of workweek by workweek credits allowed SNET, and said proposed order shall be submitted by July 14, 1995. Further, for the period subsequent to April 30, 1994, the parties shall confer as to an appropriate method of computing back wages owed and, failing agreement, plaintiff and SNET shall each submit a list of five special masters to whom that remaining issue may be referred for report and recommendation. Said lists shall be submitted by July 14, 1995. SNET is hereby ORDERED enjoined from further violations of the FLSA.

SO ORDERED.