121 F.3d 58
 134 Lab.Cas. P 33,569, 4 Wage & Hour Cas.2d (BNA) 33
 Robert R. REICH, Secretary of Labor, United States
Department of Labor, Plaintiff-Appellee,
v.
SOUTHERN NEW ENGLAND TELECOMMUNICATIONS CORPORATION, and
Southern New England Telephone Company, Inc.,
Defendants-Appellants.
 Nos. 374, 375, Dockets 95-6207, 95-6239.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 1, 1996.
Decided July 31, 1997.
 
 Burton Kainen, Kainen, Starr, Garfield, Wright & Escalera, Hartford, CT (Miguel A. Escalera, Vaughan Finn, Kainen, Starr, Garfield, Wright & Escalera, Hartford, CT; Madelyn DeMatteo, Vice President and General Counsel, John K. Costello, Carole F. Wilder, the Southern New England Telecommunications Corp. and the Southern New England Telephone Corp., New Haven, CT, of counsel) for Defendants-Appellants.
 Paul L. Frieden, United States Department of Labor, Washington, DC (J. David McAteer, Acting Solictor of Labor, Steven J. Mandel, William J. Stone, United States Department of Labor, Washington, DC, of counsel) for Plaintiff-Appellee.
 Stephen S. Ostrach, Cynthia L. Amara, New England Legal Foundation, Boston, MA, for Connecticut Business & Industry Association and the United States Telephone Association, amici curiae.
 Before: FEINBERG, WALKER, and JACOBS, Circuit Judges.
 WALKER, Circuit Judge.
 
 
 1
 On June 2, 1993, the Secretary of the United States Department of Labor ("Secretary") brought suit against defendants, the Southern New England Telecommunications Corp. and the Southern New England Telephone Company (collectively, "SNET" or "the company") on behalf of some 1500 outside craft workers employed by SNET, seeking to enjoin violations of the overtime and recordkeeping provisions of the Fair Labor Standards Act ("FLSA" or the "Act"), 29 U.S.C. §§ 207, 211(c), 215(a)(2), and 215(a)(5). The complaint alleged that SNET failed to compensate the company's outside craft workers for 30-minute lunch breaks which SNET required them to spend at outside work sites to provide security and ensure safety at the sites. The Secretary sought back overtime pay and liquidated damages as well as injunctive relief.
 
 
 2
 After a nine-day bench trial, the United States District Court for the District of Connecticut (T.F. Gilroy Daly, Judge ) issued a memorandum decision on June 14, 1995, finding that because SNET's outside craft workers "perform[ed] substantial duties during their lunch periods that [were] predominantly for the benefit of SNET," Reich v. Southern New England Telecommunications Corp., 892 F.Supp. 389, 402 (D.Conn.1995), SNET violated the FLSA by not compensating them.[1] The district court enjoined SNET from committing future violations of the FLSA and found SNET liable for actual and liquidated damages. In a subsequent judgment, entered August 28, 1995, the district court awarded the workers actual damages, in the form of back pay, of $4,823,884.60 and an equal amount of liquidated damages for a total of $9,647,769.20. On January 29, 1996, the district court entered an amended judgment directing SNET to pay an additional $88,893.33 in overdue wages. This appeal followed. We affirm.
 
 I. BACKGROUND
 
 3
 We assume familiarity with Judge Daly's opinion, see Reich v. Southern New England Telecommunications Corp., 892 F.Supp. 389 (D.Conn.1995), and restate only those facts necessary for the disposition of this appeal. SNET, based in New Haven, Connecticut, provides telephone and other services to consumers throughout the state. The company employs workers who spend a significant portion of their time on-site, out-of-doors ("outside craft employees"). From sometime in 1990 until February 1994, SNET categorized these workers into three groups: outside plant technicians ("OPTs"), who install and replace telephone poles and cables, generally in crews from two to six; assistant supervisors of construction ("ASCs"), who supervise the work of OPTs; and communication facilities technicians ("CFTs"), who work both indoors and outdoors in cable splicing and repair and in telephone installation and maintenance. In approximately February 1994, SNET eliminated the CFT category and redesignated those workers into three separate categories: network deployment technicians (formerly cable splicers), network delivery technicians (formerly cable repair workers), and service delivery technicians (formerly installation and maintenance workers).
 
 
 4
 Outside craft employees, with the exception of those performing installation and maintenance tasks indoors, routinely work on the lines strung between telephone poles, in trenches (usually located in new housing developments), and in manholes. However, some of the work of outside craft employees is performed inside, in controlled environmental vaults at central office locations. Installation and maintenance workers, who install and repair telephone equipment in homes and businesses, do some work at outside locations, such as connecting links from buildings to nearby terminal poles; however, the Secretary conceded that the lunch periods of these workers would not be compensable given the general flexibility of their work schedules.
 
 
 5
 The specific work assignments of outside craft employees vary in duration from as brief as 45 minutes to a day or more. Outside craft employees use valuable company equipment including trucks (with extendable ladders or buckets for aerial work), fresh air ventilation systems, water pumps, gas testing and fiber optic devices, cable and wire, as well as numerous hand held tools. It is also their responsibility throughout their shift to maintain and protect this equipment from theft and, at times, the elements.
 
 
 6
 SNET's outside craft employees are so-called "lunch carrying employees." Although these workers are not paid by SNET for the time they spend on lunch break and SNET does not record this time as part of their compensable employment hours, their employer requires them to bring their lunch to work and, generally, to stay at the work site during lunch. The workers are allotted thirty minutes for lunch. The company instructs them to take their lunch break between 12:00 and 12:30 p.m., if possible; however, there is sufficient unpredictability in the work that a noon break is not always possible, and frequently the workers are unable to plan the precise time and place of the break. Whenever the lunch break occurs at an open outdoor site, SNET requires the craft workers to stay at the site to secure the area and its equipment and to prevent possible harm to the public. Leaving an open work site during the shift without specific permission is sanctionable conduct. As a consequence, outside craft employees at open sites take their lunch break at or near the work site, often in the cab of a truck or near a manhole, trench, or telephone pole.
 
 
 7
 The district court concluded that SNET's restrictions on outside craft employees resulted in their performance of substantial duties predominantly for the benefit of the SNET. The district court found (1) that the company violated the record keeping provisions of the FLSA in failing to account for the duties that outside workers performed during their lunch break and (2) that, when such duties cause outside craft employees to work more than forty hours per week, SNET violated the overtime compensation provision of the Act. The district court entered judgment in favor of the Secretary, awarding back overtime pay as well as liquidated damages and enjoining further violations of the FLSA.
 
 II. DISCUSSION
 
 8
 SNET argues that the district court erred in finding liability for unpaid wages for the on-site lunch break taken by SNET's outside craft employees. The company contends that the district court misapplied the appropriate standard (the "predominant benefit" standard) for determining whether company-imposed restrictions on employees' mealtime require compensation under the FLSA. SNET also challenges several further conclusions of the district court. First, even assuming that some lunch breaks were compensable within the meaning of the FLSA, SNET maintains that the district court committed factual error in finding too many to be compensable. Second, SNET argues that the district court reached an inaccurate damage award. Finally, the company contends that the district court lacked jurisdiction to enter an award of liquidated damages, and, in any event, abused its discretion in making the award.
 
 
 9
 A. Liability for Unpaid Wages.
 
 
 10
 The FLSA requires compensation at one and a half times the regular rate when employers cause their employees to work more than forty hours a week. See 29 U.S.C. § 207(a)(1). The Secretary contends that SNET systematically undercompensated its outside craft employees by failing to pay them overtime wages for activities performed during their lunch break. Such work, according to the Secretary, caused the outside craft workers to be employed for more than forty hours per week. Thus, the crux of this dispute is whether the restrictions imposed by SNET on its outside craft workers transform an otherwise uncompensable meal break into one that is compensable under the FLSA. This is an issue of first impression in the Second Circuit.
 
 
 11
 In aid of its enforcement authority under the FLSA, the Department of Labor ("DoL") has issued interpretive regulations, in effect at all times relevant to this appeal, that specifically address compensability of employees' mealtimes.
 
 
 12
 (a) Bona fide meal periods. Bona fide meal periods are not worktime.... The employee must be completely relieved from duty for the purposes of eating regular meals.... The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating.
 
 
 13
 (b) Where no permission to leave premises. It is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period.
 
 
 14
 29 C.F.R. § 785.19 (citations omitted) (emphasis added). SNET's liability would not be in doubt if we were to apply this regulation as written. It is not open to reasonable question that SNET did not completely relieve its outside craft employees from duty during their lunch break. However, the Secretary concedes that the test is not so rigid. Rather, the Secretary contends that § 785.19 should be construed in a "practical manner" and points us to certain agency constructions of the regulation.
 
 
 15
 In a Wage-Hour Opinion Letter, dated August 25, 1980, the DoL's then-Deputy Administrator found that postal employees responsible for the safekeeping of their mail during lunch break generally were not entitled to compensation under the FLSA. In so construing § 785.19, the DoL's representative commented that a
 
 
 16
 broad reading of the phrase "relieved of all duty" ... would extend the requirement of compensation to 24 hours of the day in the case of outside workers who are required to take their employer's tools or materials home with them or who drive home in the company's vehicles, so as to have them available for going directly to the work site the following morning.
 
 
 17
 Secretary of Labor's Supplemental Appendix at 6 (Letter of Henry T. White, Jr., Deputy Administrator, U.S. Dep't of Labor (Aug. 25, 1980)). The Wage-Hour letter continues: "compensation would be required for a letter carrier only if the postal material in his possession were of such quantity or of such nature that the carrier's mealtime was substantially impeded in the free disposition of the time for his own beneficial use." Id.
 
 
 18
 In a DoL letter of July 29, 1985, construing § 785.19 in the context of law enforcement employees' meal break, the DoL's representative commented:
 
 
 19
 we would not consider the fact that [law enforcement employees] remain in uniform [during meals] as meaning that they are on duty while eating a meal. Moreover, we would not consider infrequent interruptions of short duration which may occur when a citizen compliments, or asks the law enforcement employee a simple question, as nullifying the exclusion of an otherwise bona fide meal period from compensable hours of work.
 
 
 20
 Id. at 9 (Letter of Susan R. Meisinger, Deputy Under Secretary, U.S. Dep't of Labor (July 29, 1985)). Although this letter also states that a meal break must be an "uninterrupted period during which the employee has no duties whatsoever to perform," id., and thus suggests a broader view of compensability of meal periods under the FLSA, the Secretary in its brief cites both letters as examples of the DoL's "practical," and thus implicitly flexible, approach to construing § 785.19. See Brief of Secretary of Labor at 19-21. This flexible approach to determining compensability of meal break activity is consistent with the reasoning of various courts.
 
 
 21
 The central issue in mealtime cases is whether employees are required to "work" as that term is understood under the FLSA. See Henson v. Pulaski County Sheriff Dep't, 6 F.3d 531, 533-34 (8th Cir.1993). Although the FLSA itself does not define "work," the Supreme Court has attempted to do so. In Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598, 64 S.Ct. 698, 703, 88 L.Ed. 949 (1944), the Court held that "work" under the FLSA means "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." At about the same time, the Court counseled that the determination of what constitutes work is necessarily fact-bound. See, e.g., Armour & Co. v. Wantock, 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944) ("Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case."); Skidmore v. Swift & Co., 323 U.S. 134, 136-37, 65 S.Ct. 161, 162-63, 89 L.Ed. 124 (1944) (similar). For example, time spent waiting for an event to occur, such as a fire, may constitute work if an employer hired an employee for that function. See Armour, 323 U.S. at 133-34, 65 S.Ct. at 168-69; Skidmore, 323 U.S. at 136-37, 65 S.Ct. at 162-63.
 
 
 22
 To be consistent with the FLSA's use of the term "work" as construed in Armour and Skidmore, we believe § 785.19 must be interpreted to require compensation for a meal break during which a worker performs activities predominantly for the benefit of the employer. See Lamon v. City of Shawnee, Kansas, 972 F.2d 1145, 1155 (10th Cir.1992) (compensation required during meal periods except "when the employee's time is not spent predominantly for the benefit of the employer"); Henson, 6 F.3d at 534 (same); Myracle v. General Elec. Co., 1994 WL 456769 at * 4 (6th Cir. Aug. 23, 1994) (per curiam) (same); Alexander v. City of Chicago, 994 F.2d 333, 337 (7th Cir.1993) (same); see also Hill v. United States, 751 F.2d 810, 814 (6th Cir.1984) (meal periods not compensable unless activities "could be characterized as substantial"). But see Kohlheim v. Glynn County, Georgia, 915 F.2d 1473, 1477 (11th Cir.1990) ("essential consideration ... is whether the employees are in fact relieved from work for the purpose of eating a regularly scheduled meal"); Donovan v. Bel-Loc Diner, Inc., 780 F.2d 1113, 1115 n. 1 (4th Cir.1985) (adopting, without comment, § 785.19's completely-removed-from-duty standard). In our view, this "predominant benefit" standard "sensibly integrates developing case law with the regulations' language and purpose," Alexander, 994 F.2d at 337, and more importantly, with the language of the FLSA itself.
 
 
 23
 To the extent that the Secretary advocates a literal reading of § 785.19, similar to that adopted by the Fourth Circuit in Bel-Loc Diner, 780 F.2d at 1115 n. 1, we decline to follow this construction. Section 785.19, as with other interpretive regulations issued by the Secretary under the FLSA, does not have the force of law. See, e.g., Skidmore, 323 U.S. at 139, 65 S.Ct. at 164; Freeman v. National Broad. Co., 80 F.3d 78, 83-84 (2d Cir.1996). Although not controlling on courts, such regulations do "constitute a body of experience and informed judgement to which courts and litigants may properly resort for guidance," Skidmore, 323 U.S. at 140, 65 S.Ct. at 164, and should be viewed as persuasive authority. See Reich v. State of New York, 3 F.3d 581, 588 (2d Cir.1993). However, "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore, 323 U.S. at 140, 65 S.Ct. at 164. See also Reich, 3 F.3d at 588. Here, § 785.19, as literally construed, fails to persuade us primarily because the completely-removed-from-duty standard is inconsistent with controlling Supreme Court precedent defining "work." See Henson, 6 F.3d at 535. Thus, we believe that the district court was correct in holding that meal periods are compensable under the FLSA when employees during a meal break perform duties predominantly for the benefit of the employer.
 
 
 24
 SNET does not dispute the applicability of the predominant benefit standard but argues that the district court ignored this standard and effectively applied the completely-removed-from-duty standard. We disagree.
 
 
 25
 SNET argues that the lunch breaks predominantly benefit the workers, and not the employer, because during their lunch break the workers' safety and security roles are wholly passive, leaving them free to eat their meal. This argument, whatever its superficial appeal, misses the point. During their lunch break, the workers are restricted to the site for the purpose of performing valuable security service for the company. The importance, indeed indispensability, of these services is evidenced by the mandatory nature of the restrictions that surround the workers' lunch break. To be sure, the workers perform different services during meal breaks than throughout the rest of the day, but the workers' on-site presence is solely for the benefit of the employer and, in their absence, the company would have to pay others to perform those same services. By not compensating these workers, SNET is effectively receiving free labor.
 
 
 26
 SNET's second argument invokes policy and economic concerns. The company contends that a finding of liability would
 
 
 27
 require payment for meals in any industry in which the nature of the work compels employees to remain at or near an outdoor work site, not because they are required to work during their meal periods, but solely because a complex set-up or a particular location makes it impractical to shut down and leave the job site.
 
 
 28
 Brief on Behalf of Defendants-Appellants at 23. This argument, however, fails to acknowledge that the workers are not compelled by "the nature of their work" to remain at the job site but are required to do so by their employer, on pain of discipline, for the purpose of providing important (albeit non-taxing) security, maintenance and safety services. See SNET, 892 F.Supp. at 393-95. Thus, SNET's argument begs the question at issue in this case: whether outside craft workers were "working" within the meaning of the FLSA during their constrained mealtimes.
 
 
 29
 Third, SNET argues that the district court's decision conflicts with decisions in several other circuits that have applied the predominant benefit standard. The cases relied upon by SNET, however, are distinguishable. In Avery v. City of Talladega, 24 F.3d 1337, 1347 (11th Cir.1994), Henson, 6 F.3d at 536, and Armitage v. City of Emporia, 982 F.2d 430, 432-33 (10th Cir.1992), the lunch break of law enforcement officers was held not to be compensable. In these cases the officers were permitted during their break to leave their work stations to tend to personal matters. Avery, 24 F.3d at 1347; Henson, 6 F.3d at 536; Armitage, 982 F.2d at 431. The only restrictions were requirements that officers remain in uniform, Avery, 24 F.3d at 1347, and respond to calls for assistance and inquiries from the public, Avery, 24 F.3d at 1347; Henson, 6 F.3d at 536; Armitage, 982 F.2d at 431. These cases differ from the case at bar in the same way that being on call differs from being on duty.
 
 
 30
 Similarly, in Myracle, plant employees were generally permitted to choose the time and location of their meals and were even permitted to leave the plant during their break. 33 F.3d 55, 1994 WL 456769, at * 2. The only arguable limitation was that employees often chose (but were not required) to eat lunch in a room adjacent to their work area so that they could monitor their machines, to forestall potential malfunctions. Id. In this case, SNET requires outside craft employees at open sites to remain on-site to maintain public safety and provide security to the area.
 
 
 31
 Finally, in Hill, 751 F.2d at 811, 814, letter carriers were given a choice of locations at which to eat lunch and, except for maintaining in their possession mail and other postal items, were not expected to perform any tasks. In Hill, as in the other cases on which SNET relies, there was considerable flexibility as to when and where the lunch break might occur.
 
 
 32
 B. The Secretary's Evidence, its Representational Capacity and the Conclusions of the District Court.
 
 
 33
 SNET also contests the district court's liability finding because (1) the sample of employees who testified was too small and (2) there were too few findings concerning outside craft workers' interruptions during lunch periods. We address each in turn.
 
 1. Representational Evidence
 
 34
 SNET contends that, while it is permissible to award back wages to an entire group of employees based on the testimony of a representative sample, the sample of 2.5 percent used by the district court was inadequate. We disagree.
 
 
 35
 When a defendant in a suit for lost wages under the FLSA fails to maintain employment records as required by the Act, an employee (or the Secretary on behalf of a group of employees) may "submit sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred." Martin v. Selker Bros., Inc., 949 F.2d 1286, 1296-97 (3d Cir.1991). In doing so, an employee (or in this case the Secretary) is simply following the instructions of the Supreme Court in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88, 66 S.Ct. 1187, 1192-93, 90 L.Ed. 1515 (1946):
 
 
 36
 where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes ... [t]he solution ... is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.
 
 
 37
 In meeting the burden under Mt. Clemens, the Secretary need not present testimony from each underpaid employee; rather, it is well-established that the Secretary may present the testimony of a representative sample of employees as part of his proof of the prima facie case under the FLSA. See Reich v. Southern Maryland Hosp., Inc., 43 F.3d 949, 951 (4th Cir.1995); Reich v. Gateway Press, Inc., 13 F.3d 685, 701-02 (3d Cir.1994).
 
 
 38
 The Secretary's burden in such cases, while not overly onerous, is to establish a prima facie case. See Gateway Press, 13 F.3d at 701; Secretary of Labor v. DeSisto, 929 F.2d 789, 793 (1st Cir.1991) (noting that "the Secretary's initial burden in these cases is minimal"). He is not required to do so in complete detail as to the wages lost by each employee. However, he must produce sufficient evidence to establish that the employees have in fact performed work for which they were improperly compensated and produce sufficient evidence to show the amount and extent of that work "as a matter of just and reasonable inference." Mt. Clemens, 328 U.S. at 687, 66 S.Ct. at 1192; cf. Gateway Press, 13 F.3d at 701. Upon meeting this burden, the burden shifts to the employer, and if the employer fails to produce evidence of the "precise amount of work performed" or evidence to "negative the reasonableness of the inference to be drawn from the employee's evidence," the court may then "award damages to the employee[s], even though the result be only approximate." Mt. Clemens, 328 U.S. at 687-88, 66 S.Ct. at 1192.
 
 
 39
 The Secretary presented the testimony of thirty-nine employees, accounting for each of the five job categories in question. See DeSisto, 929 F.2d at 793 ("Where the employees fall into several job categories, it seems to us that, at a minimum, the testimony of a representative employee from, or a person with first-hand knowledge of, each of the categories is essential to support a back pay award."). These witnesses served directly in four of the job categories (OPTs, network deployment technicians/cable splicers, network delivery technicians/cable repair workers, and service delivery technicians/installation and maintenance workers), and some of the witnesses (particularly the OPTs) had firsthand knowledge of the fifth (ASCs). See SNET, 892 F.Supp. at 391-96, 402. Although the district court did not make express findings that the sample covered the three types of sites at which SNET's work is performed, it is clear from the findings and the record that witnesses had worked in all three areas and testified broadly about their experiences. See id. at 392.
 
 
 40
 Although SNET is correct that most cases resting on representational evidence "involve a fairly small employee population, a limited number of employee positions, and uniform work tasks," Reich v. Southern Maryland Hosp., Inc., 43 F.3d 949, 952 (4th Cir.1995); see, e.g., Bel-Loc Diner, 780 F.2d at 1115 (testimony of 22 employees for DoL supporting award of backpay to group of 98 employees); Donovan v. Williams Oil Co., 717 F.2d 503, 505 (10th Cir.1983) (testimony of 19 supported award to group of 34); Donovan v. Burger King Corp., 672 F.2d 221, 224-25 (1st Cir.1982) (testimony of six employees from six restaurants, with stipulations from 20 others, found to support backpay award to 246 employees at 44 restaurants); Brennan v. General Motors Acceptance Corp., 482 F.2d 825, 826, 829 (5th Cir.1973) (testimony of 16, award to 26), there is no bright line formulation that mandates reversal when the sample is below a percentage threshold. It is axiomatic that the weight to be accorded evidence is a function not of quantity but of quality, DeSisto, 929 F.2d at 793 (" 'the adequacy of the representative testimony necessarily will be determined in light of the nature of the work involved, the working conditions and relationships, and the detail and credibility of the testimony' ") (quoting, with approval, brief of Secretary of Labor), and that, depending on the nature of the facts to be proved, a very small sample of representational evidence can suffice. Cf. Mt. Clemens, 328 U.S. at 690-91, 692-93, 66 S.Ct. at 1193-94, 1194-95 (testimony of 8 of approximately 300 employees, or 2.7% of group, sufficient to establish entitlement to recovery under the FLSA). Our focus is not on the numbers in isolation but on whether the district court could reasonably conclude that there was "sufficient evidence to show the amount and extent of ... [uncompensated] work as a matter of just and reasonable inference." Id. at 687, 66 S.Ct. at 1192. In the case at bar, we cannot say that the district court's conclusion is in error.
 
 
 41
 Ultimately, we are untroubled by the quantum of representational evidence in this case because the testimony covered each clearly defined category of worker; there was actual consistency among those workers' testimony, both within each category and overall; SNET offered no contradictory testimony; the abuse arose from an admitted policy of the employer that was consistently applied; and the periods at issue were the employees' lunch hours, which are predictable, daily-recurring periods of uniform and predetermined duration. Compare Southern Maryland Hosp., 43 F.3d at 952 (finding that district court abused its discretion in relying on a representational sample consisting of 1.6% of employees covering "a variety of departments, positions, time periods, shifts, and staffing needs" when the sample failed to include employees from several departments). In other words, the focus of attention was not the level of activity of outside craft employees at open sites during their lunch break but whether and for what reasons the employees were required to remain on-site. The evidence, wholly apart from its representational nature, supported the district court's finding that the workers had the significant responsibility during their lunch break of ensuring the security of the site and the equipment and the safety of any passers-by. The district court heard testimony covering every relevant combination of workers and work site. Accordingly, we are unable to find error in Judge Daly's conclusion that the Secretary produced sufficient evidence on which to base a just and reasonable inference that SNET failed to compensate its employees in a manner consistent with the FLSA.
 
 2. The District Court's Finding of Fact
 
 42
 SNET also challenges the district court's failure to make detailed findings concerning the nature and extent of lunch period interruptions and particular safety and security concerns typically experienced by the various classifications of outside craft workers at SNET's various open work sites. This deficiency, according to SNET, led to a generalized, overly-inclusive, and ultimately inaccurate finding about the extent of compensable work performed by outside craft employees during their lunch break.
 
 
 43
 Although the district court acknowledged the differences among both the various sites at which SNET outside craft workers perform their jobs, see SNET, 892 F.Supp. at 392, 394, and the job categories of outside craft employees, see id. at 391, SNET is correct that the district court's opinion did not consider these matters in detail.[2] However, as suggested already, such job- and site-specific findings were not required to support the district court's award. Because SNET required all workers to remain on-site to provide security and ensure safety--regardless of location, type of work site, or job classification--the frequency and nature of interruptions is beside the point. Just as security guards are compensated for work at museums, as well as at rock concerts and football games, so also are SNET's outside craft workers entitled to compensation for security in pastoral, as well as urban, settings. See Armour, 323 U.S. at 133, 65 S.Ct. at 168 ("Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen.").
 
 
 44
 In sum, we uphold the district court's findings that those in the OPT category carried out compensable responsibilities at open job sites for at least 80% of their lunch periods and that those in the ASC, network delivery technician, and network deployment technician categories, as well as those in the now-defunct CFT category, carried out compensable responsibilities at open sites for at least 60% of their lunch periods. See SNET, 892 F.Supp. at 396. These calculations are supported by the record. See Fed.R.Civ.P. 52(a).
 
 
 45
 C. District Court's Damage Award.
 
 
 46
 SNET next challenges the district court's calculation of damages as excessive because it encompassed substantial amounts of time during which outside craft workers were engaged in installation and maintenance ("I & M") work--work which the parties agreed by stipulation would be excluded from the award. See Joint Appendix, Vol. I, at 270. SNET attributes this overassessment to the court's erroneous exclusion of evidence the company proffered which, the company contends, would have enabled the court to exclude from the damage calculation certain I & M work performed by outside craft workers during the relevant time period of October 1991 until April 1994. We need not consider SNET's contention that the district court committed reversible evidentiary error in failing to admit their evidence because in our view it makes no difference. Regardless of the district court's decision on this matter, its calculation of damages was proper.
 
 
 47
 It is well-settled that when an employer fails to keep adequate records of its employees' compensable work periods, as required under the FLSA, employees seeking recovery for overdue wages will not be penalized due to their employer's record-keeping default. See Mt. Clemens, 328 U.S. at 687, 66 S.Ct. at 1192. See also Brock v. Norman's Country Market, Inc., 835 F.2d 823, 828 (11th Cir.1988). A rule preventing employees from recovering for uncompensated work because they are unable to determine precisely the amount due would result in rewarding employers for violating federal law. Mt. Clemens, 328 U.S. at 687, 66 S.Ct. at 1192. Rather, in such cases, employees need only prove that they performed work for which they were not properly compensated and produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id. Upon meeting this evidentiary threshold, the fact of damage is established, and the only potential uncertainty is in the amount. See Brock v. Seto, 790 F.2d 1446, 1448 (9th Cir.1986). At this point, the burden shifts to the employer "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." Mt. Clemens, 328 U.S. at 687-88, 66 S.Ct. at 1192-93. Should the employer fail to produce such evidence, the court may award damages, even though the result is only approximate. Id. at 688, 66 S.Ct. at 1192-93.
 
 
 48
 Through the use of representational evidence, the Secretary met his burden of establishing that outside craft workers, including the majority of those in the CFT job classification, were entitled to back pay. However, both parties stipulated that certain aspects of I & M work, encompassed in the CFT classification (that is, I & M work performed in residential homes or businesses), were not compensable. See Joint Appendix, Vol. I, at 270. The Secretary adduced evidence, for the purpose of calculating damages, which treated the CFT classification as a whole, thereby including I & M work in the class of compensable employment. A week into trial, SNET countered by proffering evidence in the form of a lengthy table that purported to break down the CFT job classification into the three job functions (cable splicing, cable repair, and installation and maintenance) to which those individuals in CFT classification were primarily assigned during a given week. The district court excluded this summary, which SNET contends would have led the district court to remove I & M workers from the damage calculation.
 
 
 49
 However, SNET conceded in its post-trial motions and its briefs before this court, see Memorandum in Support of Defendant's Motion to Amend Judgment at 13 n.5, Brief on Behalf of Defendants-Appellants at 37 n.25, that all those employees in the now defunct CFT job category (cable splicers, cable repair workers, and I & M workers), were trained to perform, and from time to time did perform, each of the three tasks encompassed in that job category. Since workers who were designated to perform I & M work were also called upon at times to perform cable splicing and cable repair tasks, both of which were compensable, the evidence offered by SNET was under-inclusive. In leaving out I & M workers, it failed to account for all workers performing cable splicing and cable repair. On the other hand, the evidence of damages offered by the Secretary was, to some extent, over-inclusive, because it included I & M work performed inside residential houses and businesses by those in the CFT category. Thus, the district court was forced to choose between the two. In opting for that proffered by the Secretary, the district court--consistent with the lesson of Mt. Clemens--placed the burden of inadequate record keeping on the employer. The district court did not err in this regard.[3]
 
 
 50
 D. Liquidated Damages.
 
 
 51
 Under § 16(c) of the FLSA, 29 U.S.C. § 216(c), an employer who violates the minimum compensation provisions of the FLSA is liable for both past due wages and, in addition, an equal amount of liquidated damages. SNET challenges the district court's award of liquidated damages on the grounds that (1) the court lacked jurisdiction to enter such an award and, (2) assuming jurisdiction, it erred in entering the award in this case. We reject both arguments.
 
 
 52
 We need not pause long over SNET's contention that the district court lacked jurisdiction to enter an award of liquidated damages. In brief, SNET argues that the complaint sought only equitable relief pursuant to § 17 of the FLSA, 29 U.S.C. § 217, not unpaid wages and liquidated damages pursuant to § 16(c) of the Act, 29 U.S.C. § 216(c). This, however, is a mischaracterization of the Secretary's complaint. The Secretary clearly sought relief under both § 17 and § 16(c) and, indeed, in response to SNET's motion to strike the claim for liquidated damages, the Secretary invited SNET to request a trial by jury. See Secretary of Labor's Supplemental Appendix at 1. SNET simply declined to do so. Because "[n]othing in the FLSA, relevant case law, or the Federal Rules of Civil Procedure precludes the Secretary from seeking both legal relief under § 216(c) and equitable relief under § 217," Reich v. Tiller Helicopter Servs., Inc., 8 F.3d 1018, 1033 n. 11 (5th Cir.1993), SNET--having received notice of the Secretary's causes of action--cannot now complain that the district court was without jurisdiction to award liquidated damages.
 
 
 53
 SNET's principal contention in this regard is that the award of liquidated damages should be set aside because the district court erred in finding that SNET did not satisfy the good faith and reasonable basis elements necessary to permit a reduction in such an award. We disagree.
 
 
 54
 Under § 16(c) of the FLSA, 29 U.S.C. § 216(c), an employer who violates the compensation provisions of the Act is liable for unpaid wages "and an additional equal amount as liquidated damages."[4] However, pursuant to § 11 of the Portal-to-Portal Act, 29 U.S.C. § 260, liquidated damages may be remitted "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not in violation of the [Act]." Under 29 U.S.C. § 260, the employer bears the burden of establishing, by "plain and substantial" evidence, subjective good faith and objective reasonableness. Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 907 (3d Cir.1991); see Brock v. Wilamowsky, 833 F.2d 11, 19 (2d Cir.1987). The burden, under 29 U.S.C. § 260, "is a difficult one to meet, however, and '[d]ouble damages are the norm, single damages the exception....' " Wilamowsky, 833 F.2d at 19, quoting Walton v. United Consumers Club, Inc., 786 F.2d 303, 310 (7th Cir.1986) (Easterbrook, J.).[5]
 
 
 55
 Liquidated damages under the FLSA are considered compensatory rather than punitive in nature. See Brooklyn Sav. Bank v. O'Neill, 324 U.S. 697, 707, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945); Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 907 (3d Cir.1991). They "constitute[ ] compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." Brooklyn Sav. Bank, 324 U.S. at 707, 65 S.Ct. at 902; see also United Consumers Club, 786 F.2d at 310 ("Doubling [damages under the FLSA] is not some disfavored 'penalty.' [The Portal-to-Portal Act] made doubling discretionary rather than mandatory, but it left a strong presumption in favor of doubling, a presumption overcome only by the employer's 'good faith ... and reasonable grounds for believing that [the] act or omission was not a violation.' ").
 
 
 56
 To establish "good faith," a defendant must produce "plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it." Wilamowsky, 833 F.2d at 19. SNET contends that the district court erred in finding an absence of good faith in light of the evidence (1) that company officials did not intentionally violate the dictates of the FLSA, (2) that company officials complied with all pay obligations imposed under the collective bargaining agreement, (3) that the lunch period practices had never been the subject of a grievance by an outside craft employee, (4) that the lunch period practices were consistent with those in the industry as a whole, and (5) that company officials were unaware of any judicial or regulatory decision that required the utility to compensate outside craft workers for "providing passive security during a meal period." Brief on Behalf of Defendants-Appellants at 47-48. Although the district court ruled tersely on this matter, see SNET, 892 F.Supp. at 405, we find no error in its conclusion.
 
 
 57
 "Good faith" in this context requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them. See Cooper Elec., 940 F.2d at 908. See also Williams v. Tri-County Growers, Inc., 747 F.2d 121, 129 (3d Cir.1984). That SNET did not purposefully violate the provisions of the FLSA is not sufficient to establish that it acted in good faith. Cooper Elec., 940 F.2d at 909. Nor is good faith demonstrated by the absence of complaints on the part of employees, see Tri-County Growers, 747 F.2d at 129, or simple conformity with industry-wide practice, see Cooper Elec., 940 F.2d at 910; Wilamowsky, 833 F.2d at 19-20. Thus, although the evidence cited by SNET establishes that company officials are not scofflaws, it does not establish that SNET officials acted in good faith as understood in this context. Were SNET's argument to carry the day, anytime an employer unintentionally violates an unsettled wage or hour provision of the FLSA, the employer would be acting in good faith so long as it acted in accord with prevailing industry practice and no employee had complained. Such a view is incompatible with the compensatory nature of liquidated damages under the FLSA.
 
 
 58
 The only probative evidence of SNET's good faith is reflected in the opinion letter issued by the DoL on the propriety of the company's meal period policy. See Joint Appendix, Vol. II, at 686 (Letter of John T. McMahon, District Director, U.S. Dep't of Labor, Wage and Hour Division (Feb. 18, 1991)). It suggests that SNET took some efforts to ascertain the legality of its mealtime practices. Significantly, however, SNET failed to ask the appropriate question in its inquiry. Instead of seeking advice on whether compensation is required when outside craft employees are required to remain at open sites to ensure the security and safety of the site, they asked simply whether compensation was required by the fact that outside craft workers were required to remain on site. See Reply Brief on Behalf of Defendants-Appellants at 20-21. No agency opinion was necessary to answer this question, as the relevant regulations explicitly addresses the matter. See 29 C.F.R. § 785.19(b) (noting that "[i]t is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal"). Predictably, the opinion letter does little more than repeat this regulatory provision. Moreover, nowhere in their briefs does SNET contend that it was relying on the advice of informed counsel. Thus, SNET's inquiry was insufficient, in itself, to compel a finding of good faith and, indeed, supported a finding to the contrary.
 
 
 59
 Because we find that the district court did not err in concluding that SNET failed to act in good faith as that term is understood under the FLSA, we need not address the company's contention that its actions were objectively reasonable. Thus, we affirm the district court's award of liquidated damages.
 
 III. CONCLUSION
 
 60
 We have considered the remaining contentions of SNET and find them to be without merit. Accordingly, for the reasons set forth above we affirm the decision of the district court in its entirety.
 
 
 
 [1]
 In July 1996, Judge Daly passed away after serving on the federal bench with distinction for nearly two decades
 
 
 [2]
 The one exception being work at manhole sites, which the court addressed in some detail. See SNET, 892 F.Supp. at 401-02
 
 
 [3]
 SNET also argues that its evidence was sufficient under the Mt. Clemens framework to "negative the reasonableness of the employee's evidence." 328 U.S. at 687-88, 66 S.Ct. at 1192-93. Although SNET's evidence indicates that the award might have been somewhat generous, the evidence does not affect the reasonableness of the award. It simply points out the difficulty of precisely determining damages when the employer has failed to keep adequate records
 
 
 [4]
 "As used in the FLSA 'liquidated damages' is something of a misnomer. It is not a sum certain, determined in advance as a means of liquidating damages that may be incurred in the future. It is an award of special or exemplary damages added to the normal damages." Brock v. Superior Care, Inc., 840 F.2d 1054, 1063 n. 3 (2d Cir.1988). Congress provided for liquidated damages as a means of compensating employees "for losses they might suffer by reason of not receiving their lawful wage at the time it was due." Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 907 (3d Cir.1991)
 
 
 [5]
 However, even assuming that the employer meets its burden in this regard, the district court nonetheless may, in the exercise of its discretion, award liquidated damages under the express language of the statute. See 29 U.S.C. § 260. See also Thompson v. Sawyer, 678 F.2d 257, 282 (D.C.Cir.1982)